**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CHARLES D. SHAWKEY, II,

                Plaintiff,

v.                                  CIVIL ACTION NO.  2:09-cv-01264

LOWE'S HOME CENTERS, INC.,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant's Motion for Summary Judgment [Docket 29].  For the reasons stated below, Defendant's motion is **GRANTED**.

*I. BACKGROUND*

This action arises out of Lowe's Home Centers, Inc.'s ("Defendant's") termination of commercial sales specialist Charles "Denny" Shawkey ("Plaintiff"), on February 18, 2009.  Plaintiff had been employed by Defendant for over twenty-one years, from August 6, 1987, to February 18, 2009.  Three months prior to his termination, Lowe's Loss Prevention Managers Nathan Nisbet and Lori Keaton had observed Plaintiff on video assisting a customer, Morris Bounds, with the return of a tape measure.  Bounds and Keaton observed Plaintiff give two new tape measures to Bounds, while only taking one from Bounds in return.  Plaintiff did not charge Bounds for the tape measure nor register the exchange within the Lowe's return system.  Approximately one month after the tape measure incident, on December 20, 2009,  Keaton witnessed Plaintiff on video failing to scan a bucket of paint when another customer, Adonis Smith, was checking out of the store.  Six days later,

Zone Manager David Cantley advised Keaton that Plaintiff had paged a specific person to help load a quantity of metal remesh into Smith's truck, which in turn aroused suspicion that Plaintiff had provided Smith with an additional amount of uncharged remesh.

On February 18, 2009, Store Manager Jeff Lasater asked Plaintiff to join Area Loss Prevention Manager Brian Cook and Area Operations Manager Kelli Hoskins in the manager's office.  The parties questioned Plaintiff about these three incidents for approximately forty minutes, after which Plaintiff wrote a statement taking responsibility for the items involved in each of the incidents.  Plaintiff wrote, "I am responsible for 2 Fat Max tapes, 50 pc. Remesh and 5 gallon bucket of paint totaling $408.49 and want to pay in full for those items." (Docket 29-1 at 13.)  He also wrote that the statement was made under his own "free will" and that he "fe[lt] like [he] was treated fairly." (*Id.* at 12-13.)  Plaintiff then signed a Promissory Agreement wherein he agreed to repay Lowe's the sum total of $408.49 "because of actions during the course of my employment which caused Lowe's losses and were a violation of Lowe's ethical standards." (*Id.* at 16.)  Plaintiff then went to his car, retrieved a checkbook, and wrote a check to Lowe's for $408.49.   Plaintiff reports that he wrote the statement and check willingly in the hopes of keeping his job.  However, upon tender of the check,  Lasater terminated Plaintiff.

On October 13, 2009, Plaintiff filed suit against Defendant in the Circuit Court of Kanawha County, West Virginia, alleging (1) negligence, (2) defamation, (3) false light invasion of privacy, (4) intentional infliction of emotional distress, (5) tortious interference with business relations, and (6) unlawful detention.  On November 18, 2009, the case was removed this Court on the basis on diversity of citizenship. 28 U.S.C. §§ 1441, 1332.

On August 9, 2010, Defendant moved for summary judgment on all counts of the complaint. Plaintiff responded in opposition on September 3, 2010, and Defendant replied on September 13, 2010.  On November 2, 2010, Defendant requested leave to file a supplemental memorandum in support of its motion.  On November 9, 2010, Plaintiff requested leave to file a supplemental exhibit. On November 18, 2010, the Court held a pretrial hearing in this matter, ordered the additional materials filed, and continued the trial date.  On November 29, 2010, Plaintiff filed a response to Defendant's supplemental reply.  On December 6, 2010, Defendant filed a reply to Plaintiff's response.  Defendant's summary judgment motion is now ripe for the Court's review.

## II. APPLICABLE LAW

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact."  Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  *The News & Observer Publ. Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  When construing such factual issues, it is well established that the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production."  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958

(4th Cir. 1984).  Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial."  *Id.*

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 256.  "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff."  *Id.* at 252.

## III. ANALYSIS

Federal courts sitting in diversity are to apply the common law of the state in which they sit.  *Erie R.R. v. Thompkins*, 304 U.S. 64 (1938).  Plaintiff's complaint alleges six common law torts: negligence, defamation, false light invasion of privacy, intentional infliction of emotional distress, tortious interference with business relations, and unlawful detention.  Accordingly, the common law of West Virginia applies in the instant case.  The Court will address each of Plaintiff's six causes of action in turn.

### A.    Negligence

In order to establish a negligence claim, Plaintiff is required to prove: (1) that Defendant owed him a legal duty; (2) that the duty was breached; (3) that Plaintiff was injured; and (4) that the injury was proximately caused by Defendant's negligence.  *Neely v. Belk, Inc*., 668 S.E.2d 189, 197

(W. Va. 2008) (quoting *Webb v. Brown & Williamson Tobacco Co.*, 2 S.E.2d 898, 899 (W. Va. 1939)).  As noted by Defendant, Plaintiff's claim falters on the very first prong of this analysis.

"[T]he threshold question in all actions in negligence is whether a duty was owed."  *Id.*  For a plaintiff to establish a prima facie case of negligence in West Virginia, "it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff.  No action for negligence will lie without a duty broken."  Syl. pt. 1, *Parsley v. Gen. Motors Acceptance Corp.*, 280 S.E.2d 703 (W. Va. 1981).  Further, the question of the existence of a duty "is not a factual question for the jury; rather[,] the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law." Syl. Pt. 5, *Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2000).  Plaintiff makes three arguments attempting to establish a legal duty in this context, and each of these arguments can be summarily rejected.

First, Plaintiff argues that Defendant "owed him a duty, as an employee, to conduct any investigation regarding theft in a responsible and competent manner, in order to avoid instances such as this, where an employee would be wrongfully accused of theft and discharged improperly." (Docket 33 at 6.)  In Plaintiff's initial response brief to Defendant's motion for summary judgment, he cites *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219 (W. Va. 1994), for the bold assertion that "[a] claim for negligent investigation of alleged employee misconduct is recognized in West Virginia." (*Id.* at 6.)  The Court assumes Plaintiff selected this case because it is, point of fact, the only searchable case in West Virginia state jurisprudence that utilizes the phrase "negligent investigation."  Not only is *Dzinglski* the only state case that has ever mentioned this particular concept, it only mentions it *in passing*—when discussing a plaintiff's claims that were *rejected* at the trial court level.  The plaintiff in *Dzinglski* did not present anything related to this issue on his

5

appeal, and the whole matter was *never considered* by the West Virginia Supreme Court of Appeals.[1]  In short, Plaintiff's argument for an existing tort of "negligent investigation," with the accompanying duty of an employer to conduct a non-negligent investigation before an employee is discharged, is not supported by any existing West Virginia law.

In West Virginia, "employees and employers alike are generally governed by the at will employment doctrine."  *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 717 (W. Va. 2001); *see also Eaton v. City of Parkersburg*, 482 S.E.2d 232, 236 (W. Va. 1996) ("In the absence of other evidence, West Virginia law presumes that employment is at will.").  "[W]hen a contract of employment is of indefinite duration, it may be terminated at any time by either party to the contract." *Swears v. R.M. Roach & Sons, Inc.*, 696 S.E.2d 1, 6 (W. Va. 2010) (quoting Syl. Pt. 2, *Wright v. Standard Ultramarine & Color Co.*, 90 S.E.2d 459 (W. Va. 1995)).  An at-will employee "serves at the will and pleasure of his or her employer and can be discharged at any time, *with or without cause*." *Id.* at 5-6 (quoting *Feliciano*, 559 S.E.2d at 718) (emphasis added); *see also Shanholtz v. Monongahela Power Co.*, 270 S.E.2d 178, 182 (W. Va. 1980) ("Either party could terminate the at-will employment with or without cause and no cause of action would accrue.").

It is undisputed that Plaintiff was an at-will employee of Defendant.  Further, Plaintiff has neither identified nor made any attempt to argue for the applicability of any of the recognized exceptions to the general rule "giving the employer the absolute right to discharge an at-will employee." *Harless v. First Nat'l Bank in Fairmont*, 246 S.E.2d 270, 275 (W. Va. 1978).  Plaintiff instead attempts to couch his claims for an employer's "duty to investigate" in the "classic tort analysis context—the forseeability of harm likely to occur in the face of negligent action." (Docket

---

[1] To Plaintiff's credit, he did eventually concede this point.  (Docket 52 at 5.)

6

52 at 5.)  In *Aikens*,  the West Virginia Supreme Court of Appeals described the scope of a general legal duty as follows:

> We recognized in *Robertson v. LeMaster*, 301 S.E.2d 563 (1983), that while foreseeability of risk is a primary consideration in determining the scope of a duty an actor owes to another, "[b]eyond the question of foreseeability, *the existence of duty also involves policy considerations underlying the core issue of the scope of the legal system's protection[.]*" *Id.* at 568. "Such considerations include the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant." *Id.*

*Aikens*, 541 S.E.2d at 581 (emphasis added).  Notwithstanding Defendant's well-founded arguments that it should not be subjected to a legal duty due to the unforseeability of Plaintiff's damages,[2] the Court finds that it would directly contradict the well-established public policy of West Virginia's at-will employment doctrine to create the legal duty for which Plaintiff advocates.  *Id*. at 592 ("This Court's obligation is to draw a line beyond which the law will not extend its protection in tort . . . It is a question of public policy."); *see also Bragg v. United States*, No. 2:10-cv-0683, 2011 WL 482835, at *8 (S.D. W. Va. Feb. 7, 2011) ("Irrespective of the foreseeability of risk factor, the court determines that overriding public policy concerns caution against imposing a legal duty upon the MSHA inspectors.").  Within the recognized limitations identified by law, an employer in West Virginia may discharge an at-will employee "at any time, *with or without cause*."  *Swears*, 696 S.E.2d at 6 (emphasis added).  It follows that there can be no duty imposed upon an employer to carefully investigate any allegations of misconduct against an at-will employee before it can be

---

[2] Upon discovering evidence of impropriety, Lowe's "did what is the right and indeed the obligation of any employer to do: it investigated the allegations of impropriety." *Dzinglski*, 445 S.E. 2d. at 227.

permitted to discharge him.[3]  Any other holding would essentially render West Virginia's at-will

employment doctrine a nullity.

Plaintiff's second argument centers around a statutory duty.  Plaintiff argues that Defendant

violated W. Va. Code § 61-3A-4, which "establishes a prima facie case [of negligence] for violation

of a statutory prohibition." (Docket 52 at 6.)  Section 61-3A-4 reads as follows:

> An act of shoplifting as defined herein, is hereby declared to constitute a breach of
> peace and any owner of merchandise, his agent or employee, or any law-enforcement
> officer who has reasonable ground to believe that a person has committed
> shoplifting, may detain such person in a reasonable manner and for a reasonable
> length of time not to exceed thirty minutes, for the purpose of investigating whether
> or not such person has committed or attempted to commit shoplifting. Such
> reasonable detention shall not constitute an arrest nor shall it render the owner of
> merchandise, his agent or employee, liable to the person detained.

*Id.*  This statute is utterly inapplicable to the case *sub judice*.  It is true that "a violation of statute is

prima facie evidence of negligence, providing that such violation is the proximate cause of the

injury." *Arbaugh v. Board of Educ., County of Pendleton*, 591 S.E.2d 235, 239 (W. Va. 2003).

However, "[w]henever a violation of a statute is the centerpiece of a theory of liability, the question

arises whether the statute creates an implied private cause of action." *Id.* (quoting *Yourtree v.*

*Hubbard*, 474 S.E.2d 613, 618 (W. Va. 1996)) (alteration in original).  In order to establish a private

cause of action, a plaintiff must satisfy the four-part test set forth in Syl. Pt. 1, *Hurley v. Allied*

*Chem. Corp.*, 262 S.E.2d 757 (W. Va. 1980):

> (1) [T]he plaintiff must be a member of the class for whose benefit the statute was
> enacted; (2) consideration must be given to legislative intent, express or implied, to
> determine whether a private cause of action was intended; (3) an analysis must be
> made of whether a private cause of action is consistent with the underlying purposes
> of the legislative scheme; and (4) such private cause of action must not intrude into
> an area delegated exclusively to the federal government.

---

[3] Accordingly, the Court declines to inquire further into Plaintiff's allegations that Defendant's
investigation in this case was negligent.

Plaintiff has made no attempt to argue for the applicability of *any* of the *Hurley* factors.  Even assuming *arguendo* that Plaintiff falls into the definition of "shoplifter" as referenced in the statute (and notwithstanding the other factual problems inherent in Plaintiff's argument, i.e. the issues of any "detention" as well as proximate causation), the plain language of § 61-3A-4 reveal it to be a measure of protection for *merchants*, not *shoplifters*.  Moreover, the West Virginia Supreme Court of Appeals has specifically stated that:

> The primary purpose of this statute is to temper the common law's harsh rule of civil liability in actions for false imprisonment. At common law, a merchant detaining someone he suspected of stealing his goods was subject to liability if it turned out the accused party was not guilty.

*Lusk v. Ira Watson Co.*, 408 S.E.2d 630, 632 (W. Va. 1991); *see also Belcher v. Wal-Mart Stores, Inc.*, 568 S.E.2d 19, 29 (W. Va. 2002) (in action for false imprisonment, noting that "[t]he *accommodations* of [§ 61-3A-4] must also be acknowledged." (emphasis added)); *State v. Farmer*, 454 S.E.2d 378, 383 n.7 (W. Va. 1994) ("W. Va. Code 61-3A-4 does *give certain persons the right to detain* an individual for investigation for not more than thirty minutes if there are reasonable grounds to suspect that the individual has shoplifted. However, this is the only statute that we are aware of which *gives a private person the authority to detain another individual*." (emphasis added)).  The few cases where this statute has been mentioned make it clear that § 61-3A-4 operates simply as a safe haven for merchants that may otherwise be subject to liability for the common law tort of false imprisonment or unlawful detention;  these cases reveal absolutely no legal basis for utilizing this statute as a private cause of action for negligence.  Indeed, the appropriate cause of action for a shoplifter detained in violation of  § 61-3A-4 is not for negligence, but for *unlawful*

*detention or false imprisonment*.  Plaintiff has referenced no law nor made any arguments that would direct the Court to a different conclusion.  Plaintiff's position is simply untenable.

Plaintiff's final argument points to another purported violation of a statutory duty.  Plaintiff argues that Defendant violated W. Va. Code § 55-7-2, the "insulting words" statute,  which provides that "[a]ll words which, from their usual construction and common acceptation, are construed as insults and tend to violence and breach of the peace, shall be actionable."  *Id*.  The Court is unclear on why Plaintiff grouped this argument with his negligence claim, as it more appropriately falls into the defamation category:

> [T]he "insulting words statute" is intended to supplement common-law actions for libel and slander and not to supplant them.  Consequently, it is intended to do two things: first, it provides a cause of action for insulting words which are communicated only to the victim of the insult without the need for publication; second, it provides a cause of action for insulting words which tend to violence and a breach of the peace.

Syl. Pt. 1, *Mauck v. City of Martinsburg*, 280 S.E.2d 216 (W. Va. 1981).  Again, Plaintiff has provided no evidence nor argument that would enable the Court to extend a cause of action for a violation of this statute into the simple negligence context.  Even more importantly, Plaintiff has not identified *how* Defendant allegedly violated this statute; he has pointed to no statements in the record that he believes "tend to violence or breach of the peace."  Bald assertions standing alone are not sufficient to withstand summary judgment.  *Wade v. Norfolk S. Corp.*,  No. 96-2333, 1997 WL 526018, at *3 (4th Cir. Aug. 27, 1997).  Accordingly, Plaintiff's argument on this issue cannot be sustained.

On a final note, Defendant has insisted that what Plaintiff is *actually* seeking in this count is damages for the negligent infliction of emotional distress ("NIED"), despite Plaintiff's protestations to the contrary.  (Docket 55 at 2 ("Because Plaintiff does not assert he experienced a

physical injury as a result of Lowe's alleged negligence, his negligence claim is one for negligent infliction of emotional distress.")); (Docket 52 at 4-5 ("Defendant mischaracterizes [Plaintiff's] claim of negligence. . . . [T]he negligent investigation resulted in an improper discharge . . . . No jurisdiction distills the cause of action down to one of negligent infliction of emotional distress."))[4] The Court will simply note that under West Virginia law, recovery is allowed for NIED "absent accompanying physical injury upon a showing of facts sufficient to guarantee that the emotional damages claim is not spurious." Syl. Pt. 10, *Marlin v. Bill Rich Constr., Inc.*, 482 S.E.2d 620 (W. Va. 1996) (quoting Syl. Pt. 2, *Ricottilli v. Summersville Memorial Hospital*, 425 S.E.2d 629 (W. Va. 1992). Plaintiff has made no such claim or related showing here. *Compare* Syl. Pt. 1, *Heldreth v. Marrs*, 425 S.E. 2d 157 (W. Va. 1992) (emotional damages claim not spurious where plaintiff witnesses a close relative suffer critical injury or death as a result of a defendant's negligent conduct), *with* Syl. Pt. 12, *Marlin,* 482 S.E.2d 620 (emotional damages claim not spurious where

--------

[4] To the extent that Defendant argues that Plaintiff's claim *must* be for NIED given the general rule in West Virginia that there can be no "recovery in tort for . . . emotional and mental trouble alone without ascertainable physical injuries arising therefrom," this argument is not entirely correct. Syl. pt. 1, *Monteleone v. Co-Operative Transit Co.*, 36 S.E.2d 475 (W. Va. 1945). As Plaintiff notes, he is also seeking lost income, benefits, and "other rewards of gainful employment." (Docket 52 at 5.) Under West Virginia law:

> An individual who sustains purely economic loss from an interruption in commerce caused by another's negligence may not recover damages in the absence of [1] physical harm to that individual's person or property, [2] a contractual relationship with the alleged tortfeasor, or [3] some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor.

Syl. Pt. 9, *Aikens*, 541 S.E.2d 576. Again, not only has Plaintiff not argued any of the above points, the Court has already established that Defendant had no legal duty to Plaintiff in this case, and as such his economic damages are precluded.

plaintiff experiences serious emotional distress based upon a fear of contracting a disease through the negligent conduct of the defendant).

Without establishing a legal duty owed by Defendant, Plaintiff's negligence claim fails as a matter of law. Therefore, Defendant's motion for summary judgment on Plaintiff's negligence claim is **GRANTED**.[5]

*B. Defamation of Character*

Defamation is a false statement that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Belcher*, 568 S.E.2d at 27 (citing Restatement (Second) of Torts § 559 (1977)); *see also* Syl. Pt. 1, *Sprouse v. Clay Commc'n, Inc.*, 211 S.E.2d 674 (W. Va .1975) (stating that statements are defamatory if they "defame the plaintiff and reflect shame, contumely, and disgrace upon him."). There is no dispute that Plaintiff is a private figure bringing a common law defamation claim. The elements to sustain a defamation claim by a private plaintiff are: "(1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. pt. 1, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (W. Va. 1984).

---

[5] The Court notes that Defendant argues that Plaintiff's negligence and intentional infliction of emotional distress claims are barred by the exclusive remedy provisions of the West Virginia Worker's Compensation Act (WVWCA). This Court has previously held in accordance with the Northern District of West Virginia's decision in *Allman v. Chancellor Health Partners, Inc.,* No. 5:08-cv-155, 2009 WL 1468457 (N.D. W. Va. May 26, 2009), that a plaintiff's claims are not barred under the WVWCA when they "allegedly result from conduct surrounding [plaintiff's] dismissal and therefore occurred outside the course of her employment." *Id.* at *8; *see also Williams v. Basic Contracting*, 5:09-cv-00049, 2010 WL 3244888, at *11 (S.D. W. Va. Aug. 17, 2010). The Court sees no reason to depart from its prior rulings in this case.

As a threshold matter, it is the Court's duty to determine as a matter of law whether a statement is "capable of a defamatory meaning." *Belcher,* 568 S.E.2d at 26 (quoting *Long v. Egnor,* 346 S.E.2d 778, 780 (W. Va. 1986)). "[D]efamation may be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference." Syl. pt. 4, *Crump,* 320 S.E.2d 70. The nature of this action makes this element difficult to analyze. Plaintiff's defamation claim rests almost entirely upon a swirl of rumors surrounding his discharge; reference to the exact verbiage of any actual *statements* made by identifiable parties has been few and far between.[6] Essentially, Plaintiff alleges that he was defamed when word spread that he was fired from Lowe's for stealing. As Plaintiff's defamation claim does not rise or fall dependent on this element, the Court will simply note that a statement imputing to Plaintiff a charge of theft is certainly "capable of a defamatory meaning" and would indeed constitute slander *per se*.[7] *Belcher,* 568 S.E.2d at 26 (quoting *Egnor,* 346 S.E.2d at 780); *see also Mauck,* 280 S.E.2d at 219 n.3 (statement is defamatory *per se* if involves "imputations of a crime of moral turpitude"); *Alderson v. Kahle,* 80 S.E. 1109,

---

[6] That the Court lacks real clarity at this point as to what specific statements are actually being utilized to constitute the defamation count in this case is unfortunate, to say the least. *See generally Susko v. Cox Enterprises, Inc.,* 5:07-cv-144, 2008 WL 4279673, at *3 (N.D. W. Va. Sept. 16, 2008) ("Under West Virginia law, for a cause of action for libel or slander to be correctly pleaded, the exact words charged to have been used . . . must be alleged with particularity." (citing *Kondos v. W. Va. Bd. of Regents,* 318 F. Supp. 394, 398 (S.D. W. Va. 1970)).

[7] Defamation *per se* is a category of defamation which satisfies the "resulting injury" element of a defamation claim: "Where the words are actionable *per se*, it is not necessary to aver or prove special damages, since in all such cases the law implies damages from the nature of the language used." *Milan v. Long,* 88 S.E. 618,620 (W. Va. 1916); *see also Workman v. Kroger Ltd. P'ship,* 5:06-cv-00446, 2007 WL 2984698, at *5 (S.D. W. Va. 2007). Statements are defamatory per se if they involve: "[1] imputations of a crime of moral turpitude, [2] imputations of a loathsome disease, [3] imputations of sexual misconduct by a woman, [4] and imputations which affect a business, trade, profession or office." *Mauck,* 280 S.E.2d at 219 n.3.

1110 (W. Va. 1914) ("[t]he words 'thief' and 'robber' are clearly actionable at common law, for they import guilt of criminal offenses.").[8]

The second element of a defamation claim requires a showing that the defamatory statement was published. "[P]ublication . . . means any form of intentional or negligent communication of a defamatory statement to a third person, that is, to someone other than the originator and the person defamed." *Crain v. Lightner*, 364 S.E.2d 778, 785 (W. Va. 1987). To defeat this element of a defamation claim, a defendant may raise the defense of privilege, which defeats all liability. *Crump*, 320 S.E.2d at 78. There are two types of privileges: absolute and qualified. *Id*. Absolute privilege situations are narrowly defined; notably, they include "where a plaintiff has *consented* to the defamation or *instigated* the publication of the defamatory statements." *Id*. (emphasis added) (citations omitted)."A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter." Syl. pt. 4, *Dzinglski*, 445 S.E.2d at 219. Unlike absolute privileges, qualified privileges may be defeated by the showing of actual malice, intent, recklessness, publication "to persons who have no reason to receive the information," or with a purpose "unrelated to the purpose of the privilege." *Crump,* 320 S.E.2d at 78 (citations omitted).

---

[8] Allegations of Plaintiff's theft from Lowe's could also conceivably fall into the *per se* category of statements which "impute[] to an officer improper conduct in his office or incompetence to discharge the duties thereof properly, or charge[] a person with incapacity in his trade or profession [.]" Syl. pt. 4, *Hancock v. Mitchell*, 98 S.E. 65 (W. Va. 1919); *Kinney v. Daniels*, 574 F.Supp. 542, 546 n.23 (S.D. W. Va.1983) (applying *Hancock* to a defamation case brought by a doctor in his professional capacity); *accord Shryock v. S.P. Calkins & Co.*, 248 F. 649, 651 (4th Cir. 1918) (applying Virginia law) ("A written publication, which affects one injuriously in his trade or calling and contains imputations against his honesty and integrity . . . constitutes a prima facie cause of action and is libelous per se.").

Defendant focuses its primary argument concerning the defamation count on the element of publication, arguing that (1) Plaintiff has offered no evidence linking Lowe's to the publication of any of the allegedly defamatory statements; and (2) any allegedly defamatory statements were subject to either an absolute or qualified privilege.

As Defendant notes, Plaintiff's evidence concerning the publication of the allegedly defamatory statements is shaky at best. Plaintiff's evidence consists of: his own statements that he had been told by three of his former customers, Jim McDaniels, Fred Tyson, and Steven Wolfe, that Lowe's employees had told them that Plaintiff had been fired for "theft" (in the case of Jim McDaniels) and for "giving stuff away" (in the case of Fred Tyson and Steven Wolfe);[9] Plaintiff's own statements that he felt as though he were being shunned by some of his other former customers, although he did not know what they had been told; Plaintiff's own statements that a Lowe's employee, Bob Wilson, had laughingly told Plaintiff that Wilson had been advising "everybody [who] has been asking about you" that Plaintiff had been fired for theft (Shawkey Dep. at 174:13-175:19); testimony of former Lowe's employee Peter John Lopetrone that "word spread throughout the store" that Plaintiff had been fired for theft on the same day that he was fired; and finally, Lopetrone's testimony that "three or four days" after Plaintiff was fired, when "everybody [was] talking about it," Lopetrone had asked "assistant manager" David Cantley if Lopetrone could also be fired for a mis-returned tape measure, and Cantley had replied, "No, it wasn't the tape measures.

---

[9] To the extent this testimony is even useful to Plaintiff, the Court notes that Plaintiff is here offering his own testimony as to what he was allegedly told by customers concerning what they say *they* were told by Defendant's employees, and as such Plaintiff is clearly offering the statements of the customers for the truth of the matter asserted. Accordingly, this testimony is plainly hearsay and does not further Plaintiff's claims. *Greensboro Prof'l Fire Fighters Ass'n v. Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) (referring to hearsay as "neither admissible nor supportive of an opposition to a motion for summary judgment").

He stole something.  They're not going to fire you for returning a tape measure." (Lopetrone Dep. at 42:7-43:9.)[10]

As is evident from the outline of Plaintiff's argument above, he is seeking no recovery from any of the actual *publishers* of the alleged defamatory statements; instead, he seeks to impute their liability to Lowe's.  Under West Virginia law, "[a] corporation 'will not be liable for a libel published by one of its agents unless he was authorized thereto, or his acts subsequently ratified.'" *Miller v. City Hosp., Inc*., 475 S.E.2d 495, 503 (W. Va. 1996) (quoting *Barger v. Hood*, 104 S.E. 280, 282 (W. Va. 1920)).  Accordingly, "in responding to the motion for summary judgment, [a plaintiff] has the burden of production to provide specific facts to show [1] the author of the statement was authorized to act by the [corporation] or [2] that her action was subsequently ratified by the [corporation]." *Id* at 503-504.

Plaintiff's argument essentially boils down to the proposition that Lowe's "must have" spread the word  that Plaintiff was fired for theft because of the speed in which "everybody knew." The Court will not permit such bald allegations to stand.  *See Runnebaum v. NationsBank,* 123 F.3d 156, 164 (4th Cir. 1997) (holding that "[u]nsupported speculation is not sufficient to defeat a summary judgment motion"); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985) (holding that a non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another").  Not only is such a claim completely speculative, it is belied by the evidence in this case.  The deposition testimony clearly shows that Plaintiff himself

---

[10] Although Plaintiff does not reference any of this testimony as supportive of his defamation claim, Defendant correctly points out that any statements made during Plaintiff's unemployment compensation hearing are absolutely privileged. *See Thacker v. Peak*, 800 F. Supp. 372, 386 (S.D. W. Va. 1992) (W. Va. Code Ann.§ 21A-10-11 makes absolutely privileged information furnished by employer or employee in connection with unemployment hearing).

told various parties that he had been terminated for theft *immediately after his discharge occurred*.

Plaintiff testified that he called Adonis Smith, the Lowe's customer involved in the paint and remesh transactions, "15, 20 minutes" after he had been terminated and told him "[t]hat me and him had been accused of theft essentially." (Shawkey Dep. at 242:22 - 243:22.)  Plaintiff also testified that Smith physically went in to Lowe's to discuss Plaintiff's termination with a manager "about an hour" after Plaintiff had been fired, and that Smith felt the theft allegation was "personal."  (*Id*. at 246:1-247:17.)  Smith tried to talk to a manager, and was told the manager "didn't want to discuss it." (*Id*. at 243:21-245:23.)

Plaintiff also testified that he had called Morris Bounds, the customer involved in the tape measure transaction, "just before" he called Smith, telling Bounds that "I was fired and why, the tape measures; and he said he would be at the store immediately to get it straightened out." (*Id*. at 277:9-279:12.)  Bounds testified that although he wasn't positive, "it seems like I went that day to go try to speak with the manager, because I knew of the tape measure issue had come up from our conversation and I did not steal . . . and I wanted to explain that." (Bounds Dep. at 49:10-49:19.) Bounds testified that he was "visibly upset" when he went to the store and wanted to "clear Denny's name." (*Id*. at 50:8-50:16.)   Again, the manager advised him that Plaintiff was no longer an employee and refused further comment.  (*Id*. at 53:10-53:12.)  Bounds further testified that he "may have spoken [his] opinion" about the termination to employees at the store after that initial visit, (*Id*. at 57:5-57:7), and went on to estimate that he has "probably told 30 to 50 people maybe" about Plaintiff's "terminat[ion] or what he was terminated for." (*Id*. at 58:11-58:24.)

Former Lowe's employee Peter John Lopetrone also provided testimony as to the rapid dissemination of the news of Plaintiff's termination.  Several employees apparently told Lopetrone that they knew Plaintiff had been fired because he had been called to the back office, which "pretty much . . . means you're probably going to be gone[]."  (*Id*. at 32:23-32:24.)  Lopetrone testified that another employee, Sherry, had told him that she knew that the Plaintiff had written a check, and "she assumed it was for stealing something from the store."  (*Id*. at 36:5-38:14.)  When Lopetrone asked a manager why Plaintiff had been fired, the manager told him it was "none of his concern." (*Id.* at 34:13-34:24.)

Quite simply, Plaintiff has offered *no evidence* supporting the proposition that Lowe's "authorized" or "ratified" any of the publishers' statements.  *Miller*, 475 S.E.2d at 503-504.  To the contrary, the only evidence in front of the Court concerning the source of the rumors reveals them to stem either from Plaintiff himself, which would render them absolutely privileged, or simply from his co-workers' assumptions based on their observations of the flurry of activity occurring the day of his discharge.  Plaintiff's own witnesses reveal a concerted position by Lowe's upper management, specifically the parties who had been directly involved in Plaintiff's termination, refusing discuss any issues related to Plaintiff's discharge.  Although Lopetrone testified that Cantley, an "assistant manager," had mentioned that Plaintiff had been fired for stealing while they engaged in a casual conversation, again, there is simply no evidence as to the source of this information, spoken at a time when "everybody was talking about it," (Lopetrone Dep. at 42:13-14:16), nor even a scintilla of evidence that Lowe's "authorized" or "ratified" this statement. *Id.* at 503-504.

Plaintiff points the Court to *Bine v. Owens*, where a grant of summary judgment on an employee-employer defamation claim was overturned, in support of his argument that there is a genuine issue of material fact in this case. 542 S.E. 2d 842 (W. Va. 2000). However, *Bine* is factually distinguishable from the case at bar. Importantly, the corporation in *Bine* "notified certain employees" that an employee had been terminated for vandalism "[t]o quash . . . rumors." *Id.* at 846. The corporation in that case took an *affirmative act* to authorize the dissemination of the allegedly defamatory information. Notably, in two cases more analogous to Plaintiff's attempt to impute liability to Lowe's for "rumors among co-workers" absent any evidence of direct participation by a corporation, both courts summarily dismissed the defamation charges. *See Rice v. Cmty. Health Ass'n*, 40 F. Supp. 2d 783, 786-787 (S.D. W. Va. 1998); *Miller*, 475 S.E.2d at 503-504; *see also Stalknaker v. Only One Dollar, Inc*. 426 S.E.2d 536, 538 (W. Va. 1992) (directing verdict for employer on defamation claim because there was "nothing in the trial testimony to suggest that [the two parties directly involved with the discipline and discharge] . . . told anyone about the discharge" and plaintiff had told "others" about the discharge and had also mentioned the allegation of "stealing").

As Plaintiff's evidence of defamation "lacks any nexus linking the alleged defamation to [Lowe's] conduct," there is no genuine issue of material fact on the issue of publication. *Rice*, 40 F. Supp. 2d at 787; *Miller*, 475 S.E.2d at 503. As Defendant did not in fact publish any defamatory statements, the Court need not address Defendant's defenses of (1) privilege or (2) truth or substantial truth. Accordingly, Defendant's motion for summary judgment on the defamation claim is **GRANTED**.

### C. False Light Invasion of Privacy

As the West Virginia Supreme Court of Appeals has noted, "there are obviously a number of similarities between actions for false light invasion of privacy and actions of defamation." *Crump*, 320 S.E. 2d at 87. However, each theory is entitled to "separate consideration and analysis." *Id*. The elements of false light invasion of privacy include the following:

> (1) [T]hat there was a public disclosure *by the Defendant* of facts regarding the Plaintiff; (2) that the facts disclosed were private facts; (3) that the disclosure of such facts is highly offensive and objectionable to a reasonable person of reasonable sensibilities; and (4) that the public has no legitimate interest in the facts disclosed.

*Benson v. AJR, Inc.*, 599 S.E.2d 747, 752 (W. Va. 2004) (emphasis added). Defendant argues that Plaintiff has failed as a matter of law to establish any facts that would support this claim.

As described above, Plaintiff has simply not presented any evidence in support of his theory that *Defendant* disclosed any facts regarding his termination. Accordingly, Defendant's motion for summary judgment on the false light invasion of privacy claim is **GRANTED**.

### D. Intentional Infliction of Emotional Distress

The elements of a claim for intentional infliction of emotional distress ("IIED"), as set forth by the Supreme Court of Appeals for West Virginia, are:

> (1) [T]hat the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, *Travis v. Alcon Laboratories, Inc.*, 504 S.E.2d 419 (W. Va. 1998). Rather than deciding whether Defendant's actions amount to intentional infliction of emotional distress, the Court must decide whether it would be reasonable for a jury to find that they do:

20

> [T]he role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. *Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.*

*Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395, 404 (W. Va. 2008) (emphasis added). Defendant argues that Plaintiff has failed to present evidence supporting the necessary elements of this claim.

Plaintiff's IIED claim centers around the investigation that Defendant conducted prior to Plaintiff's termination, which he claims he found "kind of traumatic." (Shawkey Dep. at 141:16.) Plaintiff's argument fails on the first prong. Again, Plaintiff has wholly neglected to present even a scintilla of evidence that Defendant has engaged in conduct that "truly offend[s] community notions of acceptable conduct." *Travis*, 504 S.E.2d at 425. Even construing all possible facts in favor of Plaintiff, he has pointed to no information in the record that would support a jury finding in his favor on this issue. Although Plaintiff argues throughout the pleadings that Defendant's investigation into his purported misconduct was conducted in a negligent or sub-par fashion, the standard for this tort is one of conduct that is "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency." *Travis*, Syl. Pt. 3, 504 S.E.2d 419. Plaintiff's arguments that "the investigation was handled by a neophyte" and "Lowe's merchandise was handled in many different ways" simply do not suffice to establish his claim. *See Hatfield*, 672 S.E.2d at 404 (finding no IIED where "appellees did nothing to ridicule, harass, nor make any derogatory and inappropriate statements with respect to either her employment or her termination.")

Further, Plaintiff has proven no emotional distress "so severe that no reasonable person could be expected to endure it." Syl. Pt. 3, *Travis*, 504 S.E.2d 419. When he was asked if he "suffer[ed]

any emotional injuries as a result of being questioned on the day of [his] termination," Plaintiff simply responded, "I got over it." (Shawkey Dep. at 292:5-292:8.)  Although he testified that he found the whole process "kind of traumatic" and "emotional," (Shawkey Dep. at 141:16; 295:2-4), he has amassed no medical evidence in support of this claim.  Nothing has been presented to even suggest that the effects on Plaintiff were more severe or more onerous than those suffered by any person whose employment is terminated.  Furthermore, it is apparent that any distress that Plaintiff *did* suffer "stemmed from the discharge itself and not from the investigatory process coincident with the discharge," and as such it is not sufficient to render his employer vulnerable to a claim of IIED. *Dzinglski*, 445 S.E.2d at 286.[11]

For these reasons, the Court **GRANTS** Defendant's motion for summary judgment with respect to Plaintiff's claim for intentional infliction of emotional distress.

### E. Tortious Interference with Business Relations

To establish a prima facie case of tortious interference, Plaintiff must establish: "(1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *Hatfield,* 672 S.E.2d at 403 (quoting Syl. Pt. 2, *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 166 (W. Va. 1983)).

---

[11] (Shawkey Dep. at 272:6-272:14):

> Q:  So is it the termination of your employment that upset you?
> A:  Yes, sir, that did upset me.
> Q:  If you weren't terminated on that day, would you have brought this lawsuit still?
> A:  No, I wouldn't have reason to.
> Q:  You would have been okay with the investigat[ion] if it hadn't resulted in termination?
> A:  Sure.

The essence of Plaintiff's cause of action for tortious interference is that he had a "reasonable expectation of . . . employment . . . with other do-it-yourself hardware stores in the area after he was fired by Lowe's," particularly Home Depot and Pella Windows, and "Lowe's intentionally interfered with that expected employment relationship by disseminating defamatory information to [Plaintiff's] prospective employers."  (Docket 3-1 at 8.)  Defendant argues that summary judgment on this charge is appropriate because Plaintiff has simply failed to provide any evidence of the factors enunciated in *Hatfield*.  Plaintiff responds that, although he has no direct evidence, "the inference is strong . . . considering the timeframe of the . . . applications."  (Docket 33 at 18.)

First and foremost, "*[s]peculation* as to the existence of a contractual or business relationship or expectancy is insufficient to establish that element." *Precision Piping and Instruments, Inc. v. E.I. DuPont de Nemours & Co.*, 707 F. Supp. 225, 231 (S.D. W. Va. 1998) (emphasis added).  Plaintiff has offered no evidence that he had any legitimate claim on prospective employment with Home Depot, Pella Windows, or any other employer.  Indeed, Plaintiff admits as much in his own deposition:

> Q: Have you filled out an application with any other do-it-yourself and hardware stores in the area?
> A: No, sir.  Actually, I like to go talk to the people face to face and give them a resume.
> Q: Did you have an expected employee relationship with any of them?
> A: I didn't discuss working with any of them; no but they were all – they all knew of me.  I've been around this area for years and years, so—
> Q: I guess my question is did you have any expected employment with any of them?
> A: I didn't talk to any of them about coming to work beforehand.
> Q: What about afterwards? After your termination, did you have an expected employment relationship with any of those other do-it-yourself hardware stores in the area?
> A: I tried to get jobs with them, yes.

23

(Shawkey Dep. at 301:13-302:7.)  A mere hope or attempt to obtain future employment, however well-founded, certainly does not amount to the "existence of a contractual or business relationship or expectancy" for the purposes of establishing this cause of action.  *Hatfield*,  672 S.E.2d at 403.

Moreover, Plaintiff himself admitted that he had no proof that Lowe's had acted to interfere with his attempts to obtain employment in the area:

> Q: [W]ere you told why you were not hired by any of them?
> A. No, sir.
> Q: Did any of those employers give you any reason to believe they knew about your termination?
> A: Not—no, sir.
> Q: Do you—do you have any reason to believe that someone at Lowe's intentionally told that Home Depot manager you were fired?
> A: That's what I think.
> Q: Why do you think that?
> A: In my opinion, they probably didn't want me to find work.
> Q: And who do you think said that, told them that?
> A: I'm not sure. I just have a feeling it was probably someone at the store.

(Shawkey Dep. at 198:3-198:22.)  Again, Plaintiff's mere feeling, absent any other testimony or evidence, is insufficient as a matter of law to establish "an intentional act of interference" with a business expectancy.  *Hatfield*,  672 S.E.2d at 403.

As noted above, Plaintiff can establish no support in fact or law for this claim. Accordingly, Defendant's motion for summary judgment on Plaintiff's tortious interference with business relations claim is **GRANTED**.

### F. Unlawful Detention

For his unlawful detention claim, Plaintiff reiterates the same novel argument made in his negligence count—that Defendant's questioning of Plaintiff prior to his discharge violated W. Va. Code § 61-3A-1, which allows merchants to detain shoplifters in a reasonable manner for a reasonable time not to exceed thirty minutes, and as such Defendant is liable pursuant to a private

cause of action under the statute.  This time, however, Plaintiff argues the statutory violation renders Defendant liable for unlawful detention.  As noted in the discussion of negligence above, this convoluted argument is unsupportable.

The purpose of this strange approach is, presumably, to avoid the inherent problems Plaintiff faces in attempting to meet the requirements of the more traditional tort available in this context: "the tort of false arrest /imprisonment, also known as unlawful detention, requires [1] 'the detention of a person' and [2] 'the unlawfulness of the detention and restraint.'"  *Riffe v. Armstrong*, 477 S.E.2d 535, 552 (W. Va. 1996) (*holding modified on other grounds*, *Moats v. Preston Co. Comm'n*, 521 S.E.2d 180, 187 (W. Va. 1999)).  As Plaintiff is undoubtably aware, there is simply no evidence of any conduct that would give rise to such a cause of action in this case.  Plaintiff testified that he never asked to leave the room where he was being questioned, was never told that he could not leave the room, was never physically detained, and his movement within the room was never restricted. (Shawkey Dep. 261:11-261:24.)  Indeed, Plaintiff's testimony is replete with assertions that he cooperated with the investigation willingly in the hopes of keeping his job.

Again, the Court declines Plaintiff's invitation to create a new cause of action in West Virginia.  The Court cannot countenance the position that this statute would render an employer liable in tort, on a variety of levels, for meeting with an employee for more than thirty minutes during work hours to discuss missing merchandise.  For those who are unlawfully detained, the tort of unlawful detention, false arrest, or false imprisonment is available.  It makes little sense to interpret W. Va. Code § 61-3A-1 so that a plaintiff is relieved from his burden to prove the actual "detention" portion of an "unlawful detention" tort.  Accordingly, Defendant's motion for summary judgment on Plaintiff's claim of unlawful detention is **GRANTED**.

*IV. CONCLUSION*

For the reasons set forth above, Defendant has demonstrated the absence of a genuine issue of material fact that would entitle it to judgment as a matter of law.  Accordingly, Defendant's Motion for Summary Judgment [Docket 29] is **GRANTED**. A separate Judgment Order will be entered this day implementing the rulings contained herein. The Court **DIRECTS** the Clerk to remove this case from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        March 30, 2011

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE